## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **J.D. TALIAFERRO,** | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| | § | |
| **v.** | § | **CIVIL ACTION_____** |
| | § | |
| | § | |
| | § | |
| **SAN JAC. COLLEGE,** | § | |
| **BRENDA HELLYER, ALLATIA** | § | |
| **HARRIS, SALLY JANES,** | | **TRIAL BY JURY** |
| *Defendants.* | | |

## PLAINTIFF'S, J.D. TALIAFERRO'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now J.D. Taliaferro, Plaintiff ("Plaintiff" or "Taliaferro"), by and through his attorney of record, complaining of Defendants San Jacinto College ("SJC"), Brenda Hellyer ("Hellyer"), Allatia Harris ("Harris"), Sally Janes ("Janes"); by way hereof, Taliaferro would state the following:

### I. PARTIES

A.    PLAINTIFF:

Dr. J.D. Taliaferro, Plaintiff is a resident of the geographical area of the Houston Division, Southern District of Texas.

1

B.    DEFENDANTS:

1.    SJC is a public, tax -supported junior or community college, and may be served with process herein by serving Chancellor Brenda Hellyer, San Jacinto College Administration East Building (A-1), 4624 Fairmont Parkway, Pasadena, TX 77504.

2.    Hellyer, Chancellor, being sued respectively in her individual and official capacities and may be served with process at 4624 Fairmont Parkway, Pasadena, Texas 77504.

3.    Harris, Vice Chancellor Strategic Initiatives, Workforce Development, Community Relations, and Diversity, being sued respectively in her individual and official capacities and may be served with process at 8060 Spencer Highway, Pasadena, Texas, 77505.

4.    Janes, being sued respectively in her individual and official capacities may be served with process herein at her business address, 8060 Spencer Highway, Pasadena, Texas 77505.

## II. JURISDICTION

5.    This case involves federal questions, specifically arising out of the First and Fourteenth Amendments to the Constitution of the United

States, enforceable through Title 42 §1983; consequently, this court has jurisdiction pursuant to Title 28, § 1331.

## SJC's HISTORY OF VIOLATION OF THE UNITED STATES CONSTITUTION

6.     SJC and or its policymakers have a history of violating the United States Constitution in dealing with its staff and employees; by way of example, Taliaferro lists the following:

a.     *Dr. Ann Zimmerer v Spencer*, 485 F2d.176 (1973);

b.     *Patsy Goss v. San Jacinto College*, 588 F2d.96 (1979), 595 F2d. 1119 (1979), and 593 F2d 23 (1979);

c.     *Lecil Hander v San Jacinto College*, 519 F2d.273 (1975), 593 F2. 23(1975);

d.     *John R. Johnson v. San Jacinto College*, 498 F. Supp.555 (1980).

e.     *Eddie Foster v. San Jacinto College*, # 201683500, 234th District Court, Harris County, Texas, settled on July 8, 2021.

## BACKGROUND

7.     Taliaferro (M. Acc., and Ed.D.) was hired as an Administrator, Director of Applied Technologies and Trades at SJC on January 2, 2011.

8.     Taliaferro replaced Craig Zimmerman who was promoted to Dean, and became Taliaferro's supervisor and assessor.

9.     Taliaferro inherited Zimmerman's secretary, Salena Brown, who enjoyed a very close relationship with Zimmerman, even telling Taliaferro "I don't work for you", and becoming a problem around which Taliaferro had to work; Zimmerman's close relationship with Brown was apparently not a workplace secret, except to Taliaferro.

10.     Brown began to disrupt the work of Taliaferro's department and when Taliaferro called her attention to her disruptiveness, Zimmerman arbitrarily departed from SJC's professed assessment policies, interfered on Brown's behalf, and arbitrarily scored Taliaferro down for false and personal reasons in the 2012-2013 school year, accusing Taliaferro of misogynism toward Brown; Taliaferro told Zimmerman he was going to consult with "HR" about Brown and Zimmerman responded after learning of the contact with HR that Taliaferro he had "killed his career San Jacinto College by consulting HR."

11.     It was the arbitrary refusal of Zimmerman to comply with SJC's professed performance-assessment policies which alerted Taliaferro to the systemic corruption of SJC's evaluation program by SJC's administration's use of the evaluation process to favor friends, punish non-friends, and keep critical voices suppressed.

4

12.     The annual reviewal process at SJC consists of an annual plan, a mid-year review, an end of year self-evaluation, and an end-of-year "leader evaluation", and an automatic review by "a Validation team" consisting of "..the respective Provost, Vice-Chancellor, or Deputy President"; Zimmerman annually evaluated Taliaferro, and for the 2012-2013 school year scored Taliaferro below "Valuable" (a public-school , report card grade of "C"), presumably (using a public school report card grade of "D" or "F"), setting Taliaferro up for a predictable termination, and notifying Taliaferro with a "shot across the bow" notice, a "Letter of Intent" ("LOI"), preceding a pre-termination "Performance Improvement Plan" ("PIP").

13.     **On August 15, 2013**, Taliaferro requested Janes reassign him to a supervisor other than Zimmerman; but Janes, refused.

14.     In the annual assessment process, the assessing supervisor's annual evaluation automatically flows to a departmental Validation Team of departmental administrators for the purpose of uniformizing department assessments with campus assessment ratings, not necessarily making criteria more objectively reflective, but using an adaptive bell curve model to make assessments uniform campus-wide.

5

15.    The Validation team predictably approved or validated Zimmerman's assessment of Taliaferro, who challenged the Validation and Zimmerman's assessment.

16.    A departmental Validation team gave Taliaferro an audience of 5 minutes to challenge Zimmerman and its affirmation, and on September 3, 2013, Harris notified Taliaferro that the "validation team ..agreed unanimously to change [Taliaferro's] performance rating for 2012-2013 to Valuable…", but leaving Zimmerman's Letter of Expectation [to] remain in effect…"

17.    SJC has not routinely complied with the rudiments of Fourteenth Amendment due process or fundamental fairness, taking the position that government as an employer should dispense with the niceties of "justice" and implement the empathy-neutral style of the roughly 143 neighboring ship-channel industries, with  fundamental fairness being triggered only by restrictively-defined, state  contractual "property interests"; consequently, SJC privately standardizes its employment practices through the medium of its non-academic, Human Resources/Risk Management  department (effectively) managed by the Systems Vice President of Human Resources PLUS, Vicki Del Bello, and implemented by

One Campus, departmental Validation Committees, and the Chancellor's campus-wide Strategic Leadership Teams ("SLT").

18.     SJC's usual practice, after campus "validation" teams and "SLTs" uniformize employee scores, the remaining evaluation extremes of good and bad evaluations (above or below Valuable scores), the non-"goldilocks" or non-Valuable scores, are automatically considered by the SLTs.

19.     The faculty of SJC has historically and openly opined, even at Senate Faculty meetings that the employee assessments are not merely reflected in a bell-type curve, but instead determined by a bell-type curve, and made to conform with a bell type curve as opposed to objectively reflecting actual employee performance; in other words, faculty and staff have historically contended the annual assessment process is not fair but designed to favor friends and punish foes.

20.     The assessment system is touted by SJC administrators as being fair and objective, characterized by SJC as follows, "One of the Guiding Principles in our performance management system is to provide transparent communication on how the process was completed. In an effort

to live by this Guiding Principle, we have prepared the 2016 Performance

Rating Distribution Curves to share with all employees.…The purpose of

validation is to ensure a consistent application of performance criteria

across the College. If you have any questions, please feel free to contact

[Vicki Del Bello] or your SLT member. The Strategic Leadership Team

(SLT) is comprised of Brenda Hellyer, Chancellor, and other key leaders

which may be viewed on this link."

21.     Not only had Taliaferro provoked Zimmerman and Janes by

outing Brown's extra allegiance to Zimmerman, Taliaferro also learned and

reported in good faith that Zimmerman was illegally overpaying another

instructor. (In 2017, Brown was hired by University of Houston (where she

lasted a short time), and Zimmerman's overpayments to the other staffer

were deemed"ok". )

22.     Taliaferro unsuccessfully applied for a Deanship within the CPD

Department under Vice Chancellor Janes, a position for which he was

qualified and which would have removed him from Zimmerman's

supervision.

23.     It was learned by Janes that Brown was secretly monitoring

Taliaferro's emails with SJC administrators and had even interrupted and

replied on her private email to correspondence between Taliaferro and HR; Brown was separated on or about 2015, and with Zimmerman's assistance became employed at UH-Downtown.

24.     After the 2012-2013 challenge by Taliaferro of Zimmerman's evaluation, and Brown's separation from the SJC, Zimmerman grudgingly assessed Taliaferro during the 2015-2016 performance evaluation as "Notable" (or in public school grading, the equivalent of a "B").

25.     However, on or about **September 22, 2016**, Janes, DelBello, and the validation committee lowered Zimmerman's "Notable" to "Valuable", and on **November 18, 2016**, DelBello published "The Performance Management Distribution Curves of 2015-2016".

26.     On **July 23, 2017**, Taliaferro again sought to promote out of Zimmerman's supervision and was encouraged by Central Campus Dean James Braswell, to apply for the position of Dean of Administration; applicants (including Taliaferro) were chosen to do a phone interview on **August 15, 2017**, and three applicants (including Taliaferro) made it through the interviews.

27.    Two of the three interviewees dropped out leaving Taliaferro as the finalist; and on **September 1, 2017**, Taliaferro was scheduled  to submit his presentation at a second interview on September 19, 2017.

28.    On **September 18, 2017**, Taliaferro received notification that his second interview was canceled and was going to be reset.

29.    On **September 25, 2017**, the Provost telephoned Taliaferro , informing him that the position would be reposted because of Hurricane Harvey.

30.    On **September 29, 2017**, the Dean of Business Administration was named the Interim Dean of Administration.

31.    In **October 2017**, Taliaferro accidentally learned that the subject position was still open, but that his application had been scrubbed/closed.

32.    Taliaferro monitored the postings and the Dean of Administration position was never reposted.

33.    Without any reposting, on **January 24, 2018**, Hellyer eliminated the promotional opportunity for Taliaferro, and hired a RIF'ed laid-off basketball coach who had not earlier applied–without posting the position.

34.     On **June 28, 2018**, Taliaferro applied for Dean of Business and Technology, to be housed in the new Lyondell Bassell Center.

35.     Zimmerman met with Taliaferro on **July 30, 2018 (9:45 to 10:15am),** and gave Taliaferro the annual evaluation of Taliaferro's performance for the 2017-2018 school year, without following the SJC procedures, and Zimmerman made negative comments unsupported by facts or supported by false facts; specifically, Taliaferro and Zimmerman met to review Taliaferro's Performance Review.

36.      Taliaferro was stunned at the mis-statements and factual inaccuracies of Zimmerman, which despite a Valuable rating, contained comments which were so demeaning.

37.     Concerned about his application for the position of Dean of Business and Technology, Taliaferro went to Vickie DelBello utilizing the grievance procedure per Policy IV-I, questioning Zimmerman, while hoping to achieve an interview for the sought position which depended on leadership.

38.     Taliaferro was then informed that the Associate Vice Chancellor and Senior Vice President of Lyondell-Bassell Center for Petrochemical Energy and Technology, who was making recommendations for the

positions which Taliaferro would apply, was himself reviewing past evaluations of applicants, including Taliaferro.

39.    Zimmerman's evaluation was a reason Taliaferro had received no interview despite his qualifications.

40.    Per policy, Taliaferro chose to not ELECTRONICALLY APPROVE Zimmerman's evaluation and challenge it, despite Zimmerman's warning regarding Brown that going to HR was harmful to Taliaferro's career at SJC.

41.    **On August 9, 2018**, Taliaferro learned from a member of the committee screening applicants for the Dean's position that the committee had two "hot applicants'; Taliaferro  replied he was an applicant, and the committee member said, "I am sorry."

42.    Taliaferro called Vickie DelBello who asked why Taliaferro had not signed Zimmerman's evaluation, to which Taliaferro replied he had not received a proper Validated Performance Review.

43.    DelBello advised that the grievance/Concern Process was Taliaferro's only available course of action.

44.    Taliaferro expressed his preference was to respond to the

document, entering his own comments in response to Zimmerman's, before

electronically signing off on the evaluation.

45.    On **August 21, 2018,** at 2:12 P.M., Taliaferro sent an email to

DelBello, [and Ramirez, Sandra; Trncak, Stephen. Subject: Alleged

Performance Review for 2017-18 Importance: High ] which stated,

> "Vickie, After careful consideration and consultation with my
> family, industry colleagues, mentors and consultants, I have decided
> to respond to my so-called "review" via written response in
> Cornerstone. My comments are attached. I agree with your
> assessment that Procedure 4.25, Secondary Review of Validated
> Performance Rating, does not apply since I am not questioning my
> rating, however**, I disagree with your recommendation of using the
> Concern Process to force Mr. Zimmerman to provide a proper
> review of my Validated Performance Review Rating and
> Validation Comments. Such logic implies that he has no
> responsibility to follow a college procedure. It should not be
> incumbent on me to force Mr. Zimmerman to do his job**. In further
> support of my position: I'm doing enough of his job as it is. **The very
> nature of the review does not follow the spirit, much less the
> stated goals of Policy IV-F-1, Performance Management for Full-
> Time Faculty, Staff and Administrators' Annual Performance
> Review.** A meeting will do nothing but demonstrate the wild
> inaccuracies and falsehoods in the document; A review of my records
> indicate that **this very situation occurred for my review in August
> 2013, except he also tried to give me a Letter of Expectation** at
> that time. **I am a reasonable person who has been threatened,
> intimidated and humiliated through the use of this review
> process. How many times must I go through this before the
> College provides a solution?** I would file a concern and demonstrate
> he is being a bully, but performance evaluations are excluded from
> that process. Are there other employees who have had this

experience? [Page 3 of 2] **When this happened in 2013, I was told directly by Craig that my career would be over. You assured me that this was not the case.** Yet, here I am again, and I have had some interesting experiences in applying for higher level positions. Again, I will be addressing the review in detail via my final comments in Cornerstone. Further, I am researching other means to affect protection from this continuing harassment. Thank you for time"(Emphasis added)

46.     DelBello responded,

"**The statement in the concerns policy pertains to ratings, not comments. However, I see where we may need to provide more clarification**. You can take your concerns regarding the evaluation comments through your leadership chain. Since you are not comfortable speaking with Craig, you can schedule an appointment with Sallie Kay. Thanks, Vickie." (Emphasis added)

47.     On **August 24, 2018**, Taliaferro wrote to DelBello regarding his

wife (at that time, also an employee of SJC),

" Kim has a payroll issue rolling into its 3rd month. From: Taliaferro, JD Sent: Friday, August 24, 2018 8:38 AM To: Del Bello, Vickie Cc: Ramirez, Sandra; Trncak, Stephen Subject: Fwd: Timesheet - K Taliaferro - Healthcare Bridge - 8-13 to 8-20 2018 Vickie: Yet another example of what can only be described as harassment. Kim has not been paid for this training for 3 months! Vicki, I have changed tactics and begun sending emails to you and your group as they happen. In the past, I have printed them, made notes, and filed away for future reference. I now have two 3" binders full! Last year was light, so it's only 1". My hope is to demonstrate how consistent this behavior is instead of letting it build up. The constant drumbeat of negativity, lack of positive feedback, and constantly defending/ explaining myself **has increased my stress to dangerous levels. I have already been ordered home by doctors once this year to take a break, and I am afraid it's about to happen again. Must I make myself ill in order**

**to do a job I enjoy very much and am very good at? Thank you**, (Emphasis added)

48.    In response, Del Bello wrote Taliaferro  stating,

"Hi JD, I am recommending that you meet with Dr. [Allatia]Harris to discuss these concerns. Would you like for me to contact her on your behalf? Thanks, Vickie

49.    On **August 27, 2018**, Taliaferro replied to DelBello,

"To: DelBello, Vickie Subject: Re: Timesheet - K Taliaferro - Healthcare Bridge - 8-13 to 8-20 2018 Vickie, I would like to take you up on setting up a meeting with Allatia. I want her opinion of my review and subsequent emails. I also want to discuss my future with the college. Thank You!

50.    On **August 27, 2018**, Taliaferro received an e-mail from Dr.

Allatia Harris,

"Hi, JD. I spoke with Vickie this afternoon, and I understand you would like to meet with me. I am available Wednesday afternoon, after 3:00, if that is a time that works for you. We can meet in my office. If that time does not work, let's look for another time. Allatia

51.    Taliaferro and Harris agreed to meet at 3:30, on **August 29, 2018**,  because Taliaferro had appointments with both his psychiatrist and psychologist. At the meeting with Dr. Harris, she had not read or reviewed Zimmerman's evaluation or Taliaferro's comments; **Dr. Harris expressed**

concern Taliaferro was keeping track of the documentation, but said

**Taliaferro was doing a good job**, I had some things to work on, but

**overall doing a good job**. Taliaferro told her there was NOTHING in

Zimmerman's evaluation that indicated such, and he was concerned about

his future at the college. **Harris avoided a direct answer until the very**

**end, and said, " [you]..may have to leave the College in order to**

**advance [his] career." (Emphasis added)**

52.    Taliaferro retained undersigned attorney and a grievance was filed by

Taliaferro on December 13, 2018, on his attorney's letterhead.

> December 13, 2018
>
> Craig Zimmerman
> Dean, Corporate Training
>
> **CPD Dean of Corporate Training**
> (281) 478-3684
> Craig.Zimmerman@sjcd.edu
>
> **GRIEVANCE : Dr. J.D. Taliaferro v. Dean Craig Zimmerman**
>
> Dr. JD Taliaferro grieves Craig Zimmerman for continuing acts creating a hostile work environment and culminating in an event which commenced on **November 28, 2018** and has apparently continued to threaten Dr. Taliaferro's career and employment with San Jacinto College.
>
> Dr. Taliaferro was hired by San Jacinto College in 2011, subject to Mr. Zimmerman's supervision.
>
> Upon his employment, Dr. Taliaferro was supplied an administrative assistant, Salena Brown.  Ms. Brown formerly reported to Mr. Zimmerman and enjoyed a very close personal

relationship with him. However, Ms. Brown retained great loyalty to Mr. Zimmerman and her relationship with Dr. Taliaferro was complicated by that loyalty. Ms. Brown apparently resented Dr. Taliaferro and made her resentments known to him, Mr. Zimmerman, and Human Resources. When Dr. Taliaferro assessed Ms. Brown's performance differently than expected by Ms. Brown, in 2012, he was targeted with her complaint of unfairness.

Mr. Zimmerman became personally hostile toward Dr. Taliaferro, and even more so when Ms. Brown separated from San Jacinto College to become employed by University of Houston which eventually terminated her employment according to Mr. Zimmerman.  Dr. Taliaferro sought advice from the college's human resource department regarding Mr. Zimmerman's continued hostility.  **When Mr. Zimmerman discovered this, he told Dr. Taliaferro that he had killed his career at San Jacinto College.(Emphasis added)**

In 2012-2013, Mr. Zimmerman arbitrarily assessed Dr. Taliaferro on his annual evaluation. Dr. Taliaferro challenged Mr. Zimmerman's evaluation and effected an upgrade of Zimmerman's original score. Seemingly the performance alteration favoring Dr. Taliaferro coupled with the conflict between Dr. Taliaferro and Zimmerman's former administrative assistant Ms. Brown further aggravated Mr. Zimmerman. In 2017, Dr. Taliaferro was a finalist for the position of Dean of Administration, a position which uniquely fit Dr. Taliaferro's qualifications. The job opening was closed even after Dr. Taliaferro was declared a finalist and an extensive executive interview had been scheduled, the cancellation of which occurring on or about October 4, 2017. Dr. Taliaferro was effectively blocked from pursuing the promotion. The Position was never re-posted but later filled by the appointment of Scott Germander, former Head Coach of the disbanded the Men's Basketball Team.

Dr. Taliaferro continued to perform key functions in the design and creation of the newly developed CPET project, with the clear understanding that he would continue to direct CPD programs.  The projects architect had even labeled one of the

offices in the new CPET building, whose CPD classrooms and labs were essentially designed by Dr. Taliaferro, to be his, Dr. Taliaferro's office.

In the spring of 2018, Dr. Taliaferro applied for the position of Dean of Business and Technology, and while eminently qualified for the position, he did not receive the usual interview. The second time that he had been denied an interview for a position for which he was well-qualified within approximately six months. The position of Dean of Business and Technology was filled without Dr. Taliaferro even being considered. Suddenly, three Directors positions for the CPET program have appeared, none of which have been publicly posted and an appointee named for one of these unposted positions.  Another unusual part being that two of the three positions were essentially the same job descriptions of Dr. Taliaferro and Jerelyn Glenn.

On November 28, 2018, Ms. Glenn and Dr. Taliaferro met with their supervisor Mr. Zimmerman, as part of a normally scheduled Directors Meeting. The subject was brought up that the CPET Director positions being posted were in fact the job descriptions of both Dr. Taliaferro and Ms. Glenn. Mr. Zimmerman cynically stated, with others in attendance, words to the effect that if Taliaferro and Glenn didn't like it, there were other colleges in the area for whom they could work.

Mr. Zimmerman's remark was a clear threat and very disturbing to both Dr. Taliaferro and Ms. Glenn. The college's process for RIF, job elimination, or termination of employment had not been noticed or followed and yet they were being informed in a rather a flip way that their jobs were being filled by someone else through some form of restructuring.

On December 5, 2018, Ms. Glenn and Dr. Taliaferro were in another meeting with Mr. Zimmerman's supervisor, Dr. Sarah Janes, as part of a normally scheduled Lead Team meeting. During the meeting, Ms. Glenn raised the issue of the CPET vacancies for the same job descriptions held by Dr. Taliaferro and herself.  Other Directors spoke of the additional workload. Dr. Janes became visibly upset and said that both Dr. Taliaferro and Ms. Glenn would stand down on their work for CPET until

further notice, and she had had an opportunity to meet with CPET's Senior Vice Chancellor Jim Griffin.

On December 6, 2018, Dr. Taliaferro was asked to meet with Mr. Zimmerman in order to discuss issues.  During the discussion, statements were made regarding CPD staff no longer participating in the CPET project.  Mr. Zimmerman asked about Dr. Taliaferro's "sore foot".  **When asked for clarification, Mr. Zimmerman responded that Taliaferro had shot himself in the foot.  This comment was not understood by Dr. Taliaferro, but there was no doubt of the final statement of the meeting by Mr. Zimmerman: "remember who signs your paycheck."**

Dr. Janes met with Mr. Griffin on December 10, 2018. After that meeting, Dr. Taliaferro met with Dr. Janes to learn the outcome of the changes meeting with Griffin. Dr. Janes told Taliaferro that CPD would not be part of CPET and that the elimination of his job would be determined by Mr. Zimmerman's evaluation, and not by the creation of the two Directors positions at CPET. **Mr. Zimmerman has used his annual assessment power to retaliate against Dr. Taliaferro in the past**.

**Dr. Taliaferro has been and is being denied promotional opportunities and apparently targeted for involuntary separation from the college by negative evaluations by Mr. Zimmerman. As part of his review for 2018, Dr. Allatia Harris told Dr. Taliaferro she did not believe he had a future with the college.**

**Dr. Taliaferro's career and employment future are being subjected to retaliatory treatment by Mr. Zimmerman in cooperation with other members of the College's administration because of his having sparked the anger of Mr. Zimmerman over the negative evaluations and issues related to Salena Brown and Mr. Zimmerman's negative evaluations, including those of 2013 and 2018.**

53.  There was no level one hearing; but SJC's lawyer, replied for

SJC to Plaintiff's counsel on **February 4, 2019**:

**Re: Grievance Filed by Dr. J.D. Taliaferro**

Dear Mr. Watts:

*As you know, we represent San Jacinto College in connection with the grievance that you filed against Craig Zimmerman (Dean of Corporate Training), on behalf of your client, Dr. J.D.Taliaferro (Director of Applied Technology and Trades). Pursuant to your December 13, 2018 correspondence, the College forwarded your grievance to my attention.*

*The College's Human Resources Department has investigated the allegations set forth in Dr. Taliaferro's grievance—including by interviewing Sarah Janes, Allatia Harris, Craig Zimmerman, Jerelyn Glenn, and Van Wigginton—and has reviewed its findings with the College's Chancellor, Dr. Brenda Hellyer. Based on the College's investigation, it appears that Dr. Taliaferro's allegation that Mr. Zimmerman has created a hostile work environment has no merit.*

**<u>Salena Brown</u>**

*Dr. Taliaferro complains about issues he encountered with his first administrative assistant, Salena Brown, who had previously worked for Mr. Zimmerman.  Although it does appear that Ms. Brown had difficulty in transitioning to Dr. Taliaferro's leadership, Ms. Brown has not worked for the College since 2012, and the College has not found any connection between Ms. Brown and any of Dr. Taliaferro's more recent complaints. Additionally, after discussing the issues regarding Ms. Brown with his leadership and Human Resources in 2012, Mr. Zimmerman understood that Dr. Taliaferro and Ms. Brown needed to work through their issues without his interference. Mr. Zimmerman has no recollection of telling Dr. Taliaferro that he had "killed his career" at the College by seeking advice from Human Resources. In fact, Mr. Zimmerman himself sought advice from Human Resources on this very subject.*

**<u>2012–2013 Performance Evaluation</u>**

*Regarding Dr. Taliaferro's 2012–2013 performance evaluation, it is true that Mr. Zimmerman rated his performance as "Room for*

*Improvement," and that the College's validation team agreed    to raise his evaluation to "Valuable." However, Mr. Zimmerman's assessment of Dr. Taliaferro's performance was not arbitrary, as he identified and addressed several program-related concerns in the evaluation. Moreover, the College's investigation did not substantiate Dr. Taliaferro's  allegation that his performance evaluation was related to his issues with Ms. Brown.*

### *Dean of Administration Position*

*Dr. Taliaferro also complains that he was not selected for the Dean of Administration position, despite supposedly having been "declared a finalist." The College posted the Dean of Administration position in 2017 (several years after the prior incidents discussed above). Although Dr. Taliaferro was selected for a first interview, all interviews were cancelled and the selection process was abated while the College attempted to place employees from athletic programs that had been eliminated. Contrary to the allegations in the grievance, Dr. Taliaferro was never selected as a finalist for this position. Finalists are only selected after all interviews have taken place. Ultimately, the College did not conduct any interviews because, after reviewing the resumes of the employees who were being displaced due to the closure of certain  athletic programs, the Chancellor appointed Scott Gernander to the Dean of Administration position. The Chancellor has the authority to appoint employees to open positions during a reduction in force. In any event, Mr. Zimmerman had nothing to do with filling this position or the Chancellor's decision to appoint Mr. Gernander.*

### *Center for Petrochemical Energy & Technology*

*Dr. Taliaferro next claims that he performed key functions in the design and creation of the newly  developed Center for Petrochemical Energy & Technology (CPET) program, with the understanding that he would continue to direct Center for Professional Development (CPD) programs. While the College initially intended for CPD to be a part of CPET, the new Associate Vice-Chancellor of CPET, Jim Griffin, determined that the College needed to hire plant employees for CPET's training programs based on their existing relationships with the*

*petrochemical industry. Mr. Zimmerman had nothing to do with this change in direction.*

### *Dean of Business and Technology/CPET Directors*

*The College posted the Dean of Business Technology position in 2018. Due to a very strong  candidate pool, Dr. Taliaferro was not selected for an interview. Mr. Zimmerman had no involvement in deciding who would be interviewed for this position.*

*There eventually will be three Directors for the CPET program. At this time, only one position has been posted, and one candidate hired (not appointed). Although another position will be posted within the next several weeks, the third position will not be posted for several months.  It should be noted, however, that the Director position that has already been filled required a Bachelor's in Chemical Engineering and five years' experience in relevant areas of the petrochemical industry.It is my understanding that Dr. Taliaferro does not meet these qualifications.*

### *Meetings with Craig Zimmerman*

*Dr. Taliaferro complains that, during a meeting on November 28, 2018, Mr. Zimmerman supposedly discussed the fact that the CPET Director positions were the same as the positions currently held by Dr. Taliaferro and Jerelyn Glenn, and that if they did not like it, there are other colleges in the area where they can work (or words to that effect).  Dr. Taliaferro claims that both   he and Ms. Glenn were very disturbed by this "threat". Ms. Glenn adamantly denies this. According to her, she did not believe that Mr. Zimmerman's comment was threatening or said in a malicious manner. To the contrary, she believed that Mr. Zimmerman was simply stating that if they did not meet the qualifications for the new Director positions (which, as noted above, are not   the same as Dr. Taliaferro's or Ms. Glenn's current positions), but were wanting another opportunity, they could research other community colleges in the area.*

*Then, on December 6, 2018, Mr. Zimmerman reportedly made a comment that Dr. Taliaferro "shot himself in the foot," and told him to*

*"remember who signs your paycheck." Mr. Zimmerman admits making these comments, in reference to Dr. Taliaferro placing all of his efforts in CPET and not into his programs in the CPD department, which pays for his salary. The College agrees that these statements were not appropriate, and has already taken steps to address this issue. These comments, however, do not rise to the level of harassment or a hostile work environment.*

*Regarding Dr. Taliaferro's meeting with Dr. Janes on December 10, 2018, Dr. Janes confirmed that she and Dr. Taliaferro discussed his position going forward, but **she specifically told him that his position would not be eliminated based on the CPET program**. **She also told him that employees generally only lose their job based on overall performance.***

***

*In closing, the College's investigation did not reveal anything substantiating Dr. Taliaferro's belief that he is being subjected to a hostile work environment, that he is being denied promotional opportunities (by Mr. Zimmerman or anyone else), or that he is being targeted for involuntary separation. Dr. Allatia Harris denies telling Dr. Taliaferro that he did not have a future with the College during his 2018 review. Rather, using herself as an example, she explained to Dr. Taliaferro that College employees are not automatically in line for a promotion, and that, if an employee wants to move up, they sometimes need to cast a larger net, and may even have to move in order to move up. Moreover, Mr. Zimmerman, Dr. Janes, and Dr. Harris have all stated that no one within the College has ever contacted them for a reference for Dr.Taliaferro. They have also stated that they have not discussed Dr. Taliaferro's evaluations with others at the College.*

*Finally, I understand that Dr. Taliaferro recently contacted Dr. Hellyer to complain that the College had not timely responded to his grievance. First, the College's grievance policy does not provide for a "Level 2" grievance. Second, Dr. Taliaferro effectively bypassed the College's policies and procedures (and their corresponding deadlines) by having you file a grievance that instructed the College to direct the grievance to my attention. Third, as noted above, the College has been investigating*

*Dr. Taliaferro's allegations. The holidays understandably delayed the College's—and our—ability to gather and review all of the relevant information.*

*If you have any further questions about this matter, please do not hesitate to contact me at (713) 554-6744 or cgilbert@thompsonhorton.com.*

> *Very truly yours,*
> *THOMPSON & HORTON LLP*

54.     After Taliaferro's grievance against Zimmerman on **December 13, 2018** , Zimmerman, having admitted telling Taliaferro on December 6, 2018 that each of himself and the foot and should remember who signed his paycheck, failed to complete his mandated mid-term evaluation of Taliaferro, making no required comments or entries.

55.     SJC assigned its outside law firm the responsibility to respond to the grievance filed on Taliaferro's behalf by and through his undersigned attorney.

56.     SJC's response to Taliaferro's grievance was served on Taliaferro on February 4, 2019.

57.     Zimmerman suddenly took leave, and in March 2019, Zimmerman suddenly retired from SJC, with Vice Chancellor Janes, Zimmerman's supervisor assuming the responsibilities of leading in supervising Taliaferro. 58.     On May 1, 2019 Janes announced to the

Department, the Continuing and Professional Development (CPD) Communications Council including Taliaferro that no one would lose her job or get a demotion if there was a restructure at SJC.

59.    Taliaferro's Assistant Kimberly Adams worked closely with Taliaferro, and has confirmed in 2020 in conversation that Taliaferro was qualified for his position, performed duties [in his position in a professional and competent manner], and that after Zimmerman left the scene, and Janes took over supervision of Plaintiff's department, **Janes publicly met with the entire department, handed out a flyer and announced,** *inter alia*, **on May 1, 2019--to the department as a whole-- a restructuring was going to occur,** <u>**but no one would lose their job**</u>.

60.    On **July 18, 2019**, Harris and Janes summoned Taliaferro to a meeting **for the purpose "..of reviewing equipment inventory**...", and instead handed him a letter signed by Harris which informed Taliaferro that he was being non-renewed effective August 19, 2019.

61.    When Taliaferro, Schacht with the information he was being given as the reason for the nonrenewal, he was told by Jane's and/or Harris the reason was the restructuring, because of the restructuring and that his position was being eliminated.

62. Along with the letter of nonrenewal which was silent as to the reason for the nonrenewal on its face, Taliaferro was given a document entitled "JD Taliaferro-Closeout Work Plan July 19-August 31, 2019".

63. On July 31, 2019, Taliaferro filed a grievance against Dr. Jane's according to the general understanding that he had of his entitlement to due process (procedural and substantive) arising out of representations made to him upon which's reliance was sought by SJC.

64. On August 6, 2019, Taliaferro made a FOIA request to Vice-Chancellor Teri Crawford, San Jacinto College Public Information Officer.

65. The request went unanswered even to this date.

66. On August 24, 2019 Taliaferro appealed his grievance against Janes to Harris.

67. Taliaferro's grievance an appeal went without response from defendants.

68. Fearful of what she might know and to control her assistance to Taliaferro, Janes promoted Kimberly Adams to become her assistant.

69. But before being promoted, Kimberly Adams discussed her information and recollections with Taliaferro, and his attorney.

## ATTACHMENTS HERETO AND INCORPORATED BY REFERENCE HEREIN

70.     Taliaferro attaches hereto Exhibit A consisting of excerpts of written practices and procedures and policies of SJC.

71.     Taliaferro attaches hereto Exhibit B consisting of experts of communications and correspondence between Taliaferro and/or his attorney on his behalf and officers, agents, or employees of SJC always relate to this matter.

## CAUSES OF ACTION

72.     Taliaferro exercised rights protected by the First Amendment to the Constitution of the United States and in retaliation therefore was subjected to denial of promotion, hostile work environment, culminating through a continuing course of actions in his nonrenewal or termination of employment.

        a.      Taliaferro spoke out on matters protected to him as a public employee by the First Amendment of the Constitution of the United States, and did not thereby disrupt the ongoing processes of the governmental entity by which he was employed;

b.      The adverse actions taken against Taliaferro by defendants in civil conspiracy were substantially or motivated by Taliaferro speech on matters of public concern in his capacity as a citizen;

c.      But for his exercise of protected speech Taliaferro would not have been denied promotion or nonrenewed;

d.      Individual defendants are not entitled as a matter of law to qualified immunity; and

e.      Individual defendants are not entitled to qualified immunity because of the existence of fact questions regarding their joint or several actions.

73.    Taliaferro was denied substantive and or procedural due process prior to defendants' joint and/or several actions to deprive him of protected liberty and/or property interests, whether undertaken individually or in civil conspiracy.

## JURY DEMAND

Plaintiff demands that this Court empanel a lawful jury to hear this case.

## RESERVATION OF RIGHTS

Plaintiff specifically reserves the right to bring additional causes of action against Defendant  and to amend this Petition as necessary.

Taliaferro declares his intent to amend this pleading as a matter of course prior to the service of summons on named defendants and/or filing of an answer by each, in accordance with the Fed. R. Civ. P.

## DAMAGES FOR MENTAL ANGUISH

As a consequence of the foregoing facts and the willful and malicious nature of the wrongs committed against the Plaintiff, Plaintiff has suffered and will suffer past, present and future severe mental anguish, for which [he/she] pleads to recover at trial.  The damages for said mental anguish exceed the minimum jurisdictional limits of this court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendants, each of them,  *be cited to appear and to answer herein and that upon jury trial, the Court enter judgment* in favor of Plaintiff against Defendants, jointly and severally, in an amount in excess of the minimum jurisdictional limits of this Court, for compensatory damages, reasonable attorneys' fees, reasonable paralegal fees, costs of court, and pre-and post-

judgment interest at the highest rate allowed by law, and for such other and

further relief, general or special, at law or in equity, to which Plaintiff may be

justly entitled.

Respectfully submitted,

WATTS & COMPANY, LAWYERS

/S/ LARRY WATTS
LARRY WATTS
SBN 20981000
P.O. BOX 2214
MISSOURI CITY, TEXAS 77459
PH. One (281) 306-6797 (Office)
PH. Two (281) 431-1500 (Direct)
FAX (877) 797-4055
wattstrial@gmail.com

ATTORNEYS FOR PLAINTIFF